# STATE ex rel Mary NEIDIG,
## Director,
### Department of Consumer and Business Services,
*Petitioner,*

*and*

## OREGON INSURANCE GUARANTY ASSOCIATION,
### an association,
*Respondent,*

*v.*

## SUPERIOR NATIONAL INSURANCE COMPANY,
### a California corporation,
### and Commercial Compensation Casualty Company,
### a California corporation,
*Appellants.*

## 00C-18554; A124825

144 P3d 1030

James N. Westwood argued the cause for appellants. With him on the briefs were Charles F. Adams and Stoel Rives LLP and John W. Buehler and Buehler & Buehler.

John L. Langslet argued the cause for respondent. With him on the brief were Justin M. Thorp and Martin, Bischoff, Templeton, Langslet & Hoffman LLP.

Before Edmonds, Presiding Judge,* and Brewer, Chief Judge, and Harris, Judge pro tempore.

BREWER, C. J.

---

* Edmonds, P. J., *vice* Wollheim, P. J.

.

**BREWER, C. J.**

Defendants Superior National Insurance Company (SNIC) and Commercial Compensation Casualty Company (CCCC), appeal a judgment in an ancillary receivership that authorizes the Oregon Insurance Guaranty Association (OIGA) to apply SNIC's surety deposits to claims arising from insurance policies issued by CCCC. The trial court concluded that, as a result of an intercompany pooling agreement, SNIC is legally responsible for CCCC's liabilities and that, in any event, the separate corporate entities of SNIC and CCCC should be disregarded for purposes of the deposits. Accordingly, the court entered a judgment authorizing OIGA to use the deposits to satisfy CCCC's liabilities. On *de novo* review,[1] we reverse and remand.

## I. BACKGROUND

A. *Schedule P deposits*

This case involves the entitlement to certain deposits that Oregon law requires workers' compensation insurers to post with the Department of Consumer and Business Services (DCBS). ORS 731.628. Those deposits, known as "Schedule P" deposits, are held in trust by DCBS "for the payment of compensation benefits * * *." ORS 731.608(3). The amount of a required Schedule P deposit is determined by a statutory formula; the amount is historically derived, that is, it is calculated based on the claims and other business history of the insurer. ORS 731.628.

Rather than post the full deposit itself, an insurer may take a credit for certain reinsurance that it obtains. "Reinsurance" refers to a contract by which "an originating insurer, called the 'ceding' insurer, procures insurance for

---

[1] An ancillary receivership is equitable in nature. *French et al. v. C. F. & T. Co. et al.*, 124 Or 686, 689, 265 P 443 (1928) ("Relief by way of receivership is equitable in its nature, and is controlled by and administered upon equitable principles, even where it has been extended by statute."). Accordingly, we "try the cause anew upon the record." ORS 19.415; *see also Mico, Inc. v. Wilbur-Ellis Company*, 39 Or App 867, 593 P2d 1276 (1979) (reviewing *de novo* in a proceeding occurring within a receivership); Ralph Ewing Clark, 2 *Clark on Receivers* § 533, 853 (3d ed 1959) ("Proceedings instituted by an intervener are proceedings in equity and are to be conducted in accordance with equity rules and practice.").

itself in another insurer, called the 'assuming' insurer or the 'reinsurer,' with respect to part or all of an insurance risk of the originating insurer." ORS 731.126. Before an insurer may take a credit for reinsurance, the reinsurer must deposit with DCBS an amount equal to the credit to be taken. ORS 731.628(2), (3). Thus, the full amount of the required deposit must be posted either by the insurer or by its reinsurers (in the event that the insurer has taken a credit).

B. *The Superior Group companies*

The deposit at issue here is the product of a complicated set of relationships among insurers, reinsurers, and reinsurers of reinsurers; to fully understand the nature of the deposit assets and to ultimately resolve the issues in this case, it is necessary to describe those relationships in some detail. Defendants are wholly owned subsidiaries of a California insurance holding company, Superior National Insurance Group (Superior Group). In December 1998, Superior Group acquired Business Insurance Group and its subsidiary insurance companies, including California Compensation Insurance Co. (CalComp) and Business Insurance Company (BICO), from Foundation Health Corporation. As part of the purchase agreement with Foundation Health Corporation, Superior Group also acquired CCCC.[2] At that time, Superior Group already owned Superior Pacific Insurance Group and its subsidiary, SNIC. Thus, in 1998, the two defendants in this case, SNIC and CCCC, came under common ownership by Superior Group.

BICO, one of the companies that Superior Group acquired in the December 1998 transaction, was immediately sold to an unrelated party, Centre Insurance Group (Centre). BICO was licensed to transact workers' compensation business in Oregon and had been writing workers' compensation insurance in Oregon for some time. Centre acquired BICO solely to take advantage of its certification to write workers' compensation insurance in Oregon; Centre was not interested in BICO's assets and liabilities. Accordingly, when

---

[2] At the time that it was acquired, CCCC was named Commercial Compensation Insurance Company. It was subsequently renamed Commercial Compensation Casualty Company. For the sake of clarity, we refer to that company throughout the opinion as CCCC.

Superior Group sold BICO to Centre, it sold it as a shell—that is, Superior Group retained BICO's assets and liabilities.

To convert BICO into a shell, thereby relieving Centre of the liability for insurance that BICO had issued, Superior Group was required to guarantee payment of BICO's outstanding liabilities. Superior Group accomplished that objective through a "loss portfolio transfer" of BICO's liabilities to Superior Group's subsidiary, CalComp. As a result of the loss portfolio transfer, CalComp became the reinsurer of BICO's then-existing liabilities. CalComp, in turn, retroceded that responsibility to SNIC, its affiliate.[3]

Because BICO was sold as a shell, Superior Group also retained its assets. Among those assets were the Schedule P surety deposits totaling approximately $10.6 million that BICO had posted with DCBS pursuant to ORS 731.628. Superior Group transferred those deposits to the books of SNIC, the retrocessionaire of BICO's obligations on the policies, to cover liabilities on pre-1999 BICO liabilities. When the BICO policies were subsequently renewed after December 1998, they were renewed as CCCC policies. CCCC was authorized to write workers' compensation insurance in Oregon and, in 1999, had security deposits in the amount of $445,000 posted with DCBS. However, by the end of 1999, CCCC had written substantially more business in Oregon, including the renewed BICO policies, and its required Schedule P deposits rose to $4,429,128. In June 2000, the California Department of Insurance placed CCCC into conservation as a consequence of significant financial difficulties that CCCC was experiencing.[4] By that time, CCCC's Schedule P deposit liability had grown to $6,570,498.

CCCC was required to file its Schedule P forms with DCBS by March 1, 2000. It did not meet that deadline. On

---

[3] The second level of reinsurance—that is, reinsurance of a reinsurer—is referred to as a "retrocession." The reinsurer of a reinsurer is referred to as a retrocessionaire. *See* Steven Plitt, Daniel Maldonado, and Joshua D. Rogers, 1A *Couch on Insurance* 3d § 9.2 (2003); *Webster's Third New Int'l Dictionary* 1940 (unabridged ed 2002).

[4] By statute, the insurance commissioner of California may be appointed to act as a conservator to rehabilitate failing insurance companies. Cal Ins Code § 1011 (2005).

March 30, 2000, the Oregon Insurance Division (the division), a division of DCBS, wrote to CCCC, requesting that CCCC complete a Schedule P form and stating that any required deposit was due by March 31, 2000. The division received no response. On August 7, 2000, the division again reminded CCCC regarding the Schedule P filing and deposit. Once more, CCCC did not respond.

C. *Negotiations regarding the Schedule P deposit*

In the meantime, other Superior Group companies were experiencing financial difficulties as well. SNIC had been placed in conservation, and the Superior Group companies had serious cash flow problems. On August 24, 2000, Stewart Levine, the manager of statutory accounting for Superior Group and its subsidiaries, sent a letter to the division that included the Schedule P filing for SNIC, but the etter did not mention CCCC. In the letter, Levine stated that SNIC's required deposit at that time was only $100,000 and that SNIC's current deposit with the division was $10,393,957. Levine requested the release of the excess deposit to SNIC. When asked why he filed SNIC's Schedule P calculation but not CCCC's, Levine testified that "the powers that be were interested in getting money back, not giving money to somebody else."

The division responded promptly to Levine's letter, indicating that it was unwilling to release SNIC's deposit until it knew what SNIC's affiliates owed. The division followed up with a fax requesting an interim report from SNIC and all of its affiliates as of June 30, 2000, and informing SNIC that an Oregon examiner would need to come to California before the division would consider releasing the deposit. Levine forwarded that fax to Trecia Nienow, corporate and regulatory counsel for Superior Group, along with a notation stating that, as of June 30, 2000, the State of Oregon owed SNIC $10,293,957, and CCCC owed the state $6,570,498.

In September 2000, Nienow spoke with Charles Nicoloff, the division's deputy administrator. Nienow informed Nicoloff that CCCC would not send any money to the State of Oregon, but she offered to transfer a portion of SNIC's deposit to cover CCCC's liability if the division would

dispense with an audit and if the balance could be released immediately to SNIC. Days later, Nienow sent Nicoloff a Schedule P for CCCC as of December 31, 1999, and a Schedule P for CCCC as of June 30, 2000. She reiterated that "we will agree to an offset against the [SNIC] deposit credit in exchange for immediate release of the excess SNIC deposit[,]" provided that no physical audit was required. Nienow concluded, "Lastly, I understand that your Attorney General will put together a consent and release evidencing this understanding."

On November 8, 2000, the division sent Nienow a draft agreement. Nearly a month later, Nienow responded with an e-mail that proposed four changes to the document, most notably, the deletion of a paragraph that would have allowed the division to seek further funds from SNIC if CCCC's calculation of its outstanding liability proved incorrect. Nicoloff responded by e-mail, confirming that the division would not perform an audit and would not seek further recovery from SNIC's deposit in the event that the remaining deposit proved inadequate to cover CCCC's outstanding liabilities. On February 9, 2001, the division sent a revised draft of the agreement to reflect the changes discussed by Nienow and Nicoloff. However, the agreement was never signed.

D. *The trial court proceedings*

In October 2000, DCBS filed a petition with the trial court for the appointment of its director as an ancillary receiver for SNIC and CCCC and for an order directing her to take possession of the security deposits of SNIC and CCCC. SNIC and CCCC did not timely respond to the petition, and the trial court entered an order appointing the director as ancillary receiver.

In December 2001, OIGA moved to intervene on the side of DCBS. OIGA, which is statutorily obligated to pay workers' compensation claims on behalf of failed insurance companies, asserted that it was entitled to disbursements from the ancillary receiver to compensate it for payments that it had made to cover the liabilities of CCCC. SNIC and CCCC did not respond to the motion to intervene, and the trial court granted the motion.

In its petition, OIGA sought a final judgment setting aside for its own benefit the balance of moneys deposited by SNIC. Initially, OIGA asserted a single claim to the effect that the funds were "erroneously" deposited with DCBS and that the court should disregard the "separate but related and commonly controlled" corporate entities of SNIC and CCCC. In an amended complaint, OIGA added a claim for breach of contract based on the alleged settlement agreement between SNIC and DCBS to offset the SNIC deposit and CCCC short-fall—an agreement that it alleged was intended to benefit OIGA. After trial, OIGA moved for and was granted leave to further amend its complaint. The amendment added a "second count" to OIGA's alter ego claim, based on an intercompany pooling agreement among SNIC, CCCC, and their affiliated companies.

After trial, the court rendered its decision concluding that SNIC's deposit assets should be made available to reimburse OIGA for liabilities arising out of claims on policies issued by CCCC. The court found that "both SNIC and [CCCC] were entirely dominated by Superior Group, and their assets and liabilities were handled essentially as a single pool available to meet the needs, and to satisfy the obligations, of the whole as it suited them." The court further found that SNIC and CCCC's "shuffling of BICO's assets and liabilities put the Oregon policyholders at risk. If [SNIC and CCCC] had simply renewed [BICO's] policies and transferred the deposit assets to the same company, the deposit assets would have covered most, if not all claims eventually made." In addition, the court determined that, under Superior Group's intercompany pooling agreement, "SNIC is the reinsurer of [CCCC]. Because a reinsurer's deposit may legally be used to pay a ceding insurer's compensation claims, SNIC's deposit may be used to pay [CCCC's] claims. ORS 731.608(3), [ORS] 731.628(1)(b)."

The trial court did not rest its decision solely on SNIC's obligations under the pooling agreement. In addition, the court concluded that "equitable principles also dictate that SNIC's deposit may be used to pay [CCCC's] claims by piercing through the corporate veils that separate these two entities." The court determined that SNIC and CCCC were commonly controlled and

"also clearly and deliberately violated ORS 731.628 in an attempt to secure a business advantage. * * *

"* * * In this case, the improper conduct, [SNIC and CCCC's] violation of ORS 731.628, caused the injury by transferring the existing BICO deposit assets to SNIC, but then renewing all BICO policies and incurring new liabilities with [CCCC]."

Thus, the trial court concluded, "both legally and equitably, SNIC's entire deposit should be available for payment of all claims and related expenses arising out of insurance policies issued by [CCCC] in Oregon." The court entered judgment to that effect, and this appeal followed.

## II. ANALYSIS

On appeal, SNIC and CCCC advance four assignments of error. First, they assign error to the trial court's decision to pierce SNIC's corporate veil, thereby making SNIC liable for CCCC's Schedule P deposit obligations. Second, they assign error to the court's post-trial decision to permit OIGA to file an amended pleading asserting a claim based on the intercompany pooling agreement. The third assignment of error challenges the trial court's determination that, based on the pooling agreement, SNIC's deposit was available to pay OIGA's claims against CCCC. Finally, in their fourth assignment of error, defendants argue that OIGA failed to prove its breach of contract claim.

### A. *The Veil-Piercing Theory*

#### 1. *Jurisdictional issues*

We first address defendants' argument that the trial court erred by upholding OIGA's veil-piercing claim. As a threshold matter, defendants argue that the claim must be dismissed for lack of jurisdiction on the ground that defendants' parent company, Superior Group, was not joined as a party. According to defendants, Superior Group is the "controlling party" and, therefore, the party against whom the judgment must run. In response, OIGA argues that (1) the asserted joinder defect was not preserved and (2) Superior Group was not a necessary party. For the reasons that follow, we conclude that Superior Group was not a necessary party.

Defendants raise the joinder issue for the first time on appeal. They contend that, because OIGA essentially seeks declaratory relief, the absence of a necessary party is a jurisdictional defect that can be raised at any stage of the proceeding. *See Vance v. Ford*, 187 Or App 412, 423-24, 67 P3d 412 (2003) ("In the declaratory judgment context, failure to join a necessary party is a jurisdictional matter. *Wright[ v. Hazen Investments, Inc.*], 293 Or [259], 264[, 648 P2d 360 (1982)]. We may consider the issue even if the parties failed to preserve it at trial or raise it on appeal."). OIGA argues, however, that ORS 28.110 is inapplicable because this is not a declaratory judgment action but, rather, an ancillary receivership. We need not decide whether OIGA's petition invoked ORS 28.110 because we conclude that, even if it did, Superior Group was not a necessary party within the meaning of that statute.

For purposes of ORS 28.110, a party is "necessary" if that party has or claims "any interest which would be affected by the declaration * * *." Defendants' argument hinges on the premise that Superior Group, as a controlling party, is the "party sought to be charged" in this action and, hence, a party whose interest would be affected by the declaration. Whether, as a matter of substantive law, the controlling party in a veil-piercing claim must also be the party sought to be charged, depends on the elements that OIGA was required to prove to recover against SNIC and CCCC.

■ ■ As the case was pleaded and tried, the judgment sought by OIGA and entered against defendants concerned deposit assets *owned by SNIC*—the funds that were held by the receiver. Defendants have not argued that Superior Group had any interest in those assets apart from its ownership interest in SNIC. That type of indirect financial interest, however, did not make Superior Group a necessary party to the instant claims against SNIC and CCCC. Individual shareholders are not, solely by virtue of that status, necessary parties in an action against a corporation. *See* ORS 60.151 (shareholders are not liable to the corporation or its creditors beyond the consideration for which the shares were authorized to be issued or specified in the subscription agreement); *City of Salem v. O.-W. Water Serv. Co.*, 144 Or 93, 105, 23 P2d 539 (1933) ("None of the courts has held that the

phrase 'interest which would be affected by the declaration' means [indirect] financial interest.").[5] Nor was Superior Group a necessary party merely because OIGA alleged that it controlled SNIC and CCCC. Although an allegation that a third party was involved in events giving rise to liability may make that party a proper party to the litigation, it does not make that party a necessary party unless the litigation affects an interest of the party. *Cf. Bennett v. Minott*, 28 Or 339, 344, 347, 39 P 997, 44 P 283 (1896) (grantor of a fraudulent conveyance is a proper, but not necessary, party in an action seeking to impose liability on grantor's alter ego corporation). Thus, we conclude that Superior Group did not have the type of interest in the subject matter of this action that would make it a necessary party for purposes of ORS 28.110.

### 2. *The elements of veil-piercing*

In *Amfac Foods v. Int'l Systems*, 294 Or 94, 654 P2d 1092 (1982), the Oregon Supreme Court discussed at length the principles underlying a claim for "veil-piercing," or disregard of the corporate form.[6] The court cautioned that "[t]he disregard of a legally established corporate entity is an extraordinary remedy which exists as a last resort, where there is no other adequate and available remedy to repair the

---

[5] Although not controlling, federal court decisions are consistent with our conclusions. *Cf. Gadd v. Pearson*, 351 F Supp 895, 902 (MD Fla 1972) (complete relief could be accorded in the absence of the subsidiary where there was no allegation that subsidiary itself possessed the funds for which the plaintiff requested an accounting and constructive trust); *Ortiz Mercado v. Puerto Rico Marine Management*, 736 F Supp 1207, 1212-13 (D PR 1990) (under FRCP 19, the mere fact that a subsidiary is wholly owned does not make the controlling parent company an indispensable party to the litigation); *Klitzner Industries, Inc. v. H.K. James & Co., Inc.*, 96 FRD 614, 615-16 (Ed Pa 1983) (allegations that a defendant is a controlling shareholder are not sufficient to render that individual a necessary or indispensable party to an action involving the corporation for purposes of FRCP 19).

[6] Courts have used various tests—and corresponding terms—to describe theories of recovery based on disregard of the corporate form, including "alter ego," "instrumentality," and "veil piercing." Philip I. Blumberg et al., 1 *Blumberg on Corporate Groups* § 10.02[B] (2d ed Supp 2006). Oregon courts typically have ignored the distinctions between those theories. *See Schlect v. Equitable Builders*, 272 Or 92, 96, 535 P2d 86 (1975) ("We need not pause to consider the vague distinction between the instrumentality or alter ego test and the identity test for disregarding the corporate entity of a wholly-owned subsidiary. Whichever test is used, it is necessary for the complainant to prove that the conduct of the parent corporation prejudiced the rights of the creditor and resulted in the perpetration of a fraud or injustice.").

plaintiff's injury." *Id.* at 103. After surveying its prior decisions, the court summarized the predicates for piercing a corporate veil:

> "When a plaintiff seeks to collect a corporate debt from a shareholder by virtue of the shareholder's control over the debtor corporation rather than on some other theory, the plaintiff must allege and prove not only that the debtor corporation was under the actual control of the shareholder but also that the plaintiff's inability to collect from the corporation resulted from some form of improper conduct on the part of the shareholder. This causation requirement has two implications. The shareholder's alleged control over the corporation must not be only potential but must actually have been exercised in a manner either causing the plaintiff to enter the transaction with the corporation or causing the corporation's default on the transaction or a resulting obligation. Likewise, the shareholder's conduct must have been improper either in relation to the plaintiff's entering the transaction or in preventing or interfering with the corporation's performance or ability to perform its obligations toward the plaintiff."

*Id.* at 108-09. We have characterized that formulation as a three-part test:

> "Thus, to pierce, the plaintiff must prove that (1) the defendant controlled the debtor corporation; (2) the defendant engaged in 'improper conduct'; and (3) as a result of that 'improper conduct,' plaintiff either entered into a transaction that it otherwise would not have entered into or plaintiff was unable to collect on a debt against the insolvent corporation."

*OPERB v. Simat, Helliesen & Eichner*, 191 Or App 408, 429, 83 P3d 350 (2004).

Although Oregon courts have not squarely applied the veil-piercing analysis in the context of affiliate corporations, before it decided *Amfac Foods*, the Supreme Court suggested that the analysis is not limited to subsidiary relationships. *See Abbott v. Bob's U-Drive et al*, 222 Or 147, 161-62, 352 P2d 598 (1960) (stating, where corporation's affairs are "confused with those of the stockholders, a subsidiary *or an affiliate corporation* the corporate veil may be lifted * * *" (emphasis added)). Even though *Amfac Foods* involved an

exception to limitations on shareholder liability, the test that the Supreme Court adopted in that case also is logically applicable where the assets at issue are held not by a controlling shareholder, but by another commonly owned and controlled affiliate.[7] Accordingly, we apply the *Amfac Foods* test to the facts of this case.

The trial court ruled that "[t]he evidence at trial established all three elements typically required for piercing the corporate veil under previous Oregon court decisions: (1) actual control; (2) improper conduct; and (3) a relationship between the improper conduct and the injury alleged." Defendants challenge each prong of that ruling. First, they argue that there was no evidence that Superior Group exercised the type of "control" over CCCC and SNIC that would justify the "extraordinary remedy" of disregarding the corporate form. Second, they assert that there was no evidence of a "wrongful act" that would satisfy the requirement of improper conduct. And finally, they argue that OIGA did not prove that its damages were actually caused by any wrongful conduct by defendants.

We briefly address defendants' argument that the element of control is missing in this case. The evidence showed that SNIC and CCCC were commonly owned by Superior Group and, among other things, shared executive officers, board members, a legal department, investment managers, accountants, and auditors.[8] Thus, the same individuals who had financial decision-making authority for SNIC made the financial decisions for CCCC. OIGA urges that the element of control is satisfied by proof that the two corporations were owned by the same parent corporation and

---

[7] Other courts have applied veil-piercing principles to prevent abuse of the corporate form among affiliate corporations. *See, e.g., Las Palmas Assoc. v. Las Palmas Center*, 235 Cal App 3d 1220, 1249, 1 Cal Rptr 2d 301 (1992) ("Generally, alter ego liability is reserved for the parent-subsidiary relationship. However, under the single-enterprise rule, liability can be found between sister companies."). Given the myriad corporate arrangements that could be used to shield assets and defraud creditors, we find it appropriate to apply the *Amfac Foods* veil-piercing principles to the allegations in this case.

[8] CCCC, which was previously incorporated in New York, did have an additional director that was not shared by SNIC. However, that director conceded that his appointment was a mere formality because of the requirements of New York law.

14

directed by the same individuals, even though the party sought to be charged is not the parent corporation, but one of the affiliates. However, we need not decide that issue because, as we now explain, in any event OIGA failed to prove the second element required to establish a veil-piercing claim.

In *Amfac Foods*, the court stated:

> "Though control is an element in the formula, we are convinced that if one does not look beyond the element of control (adding 'domination' to 'control' does not aid the analysis), hopeless confusion will be the result of an inductive effort to derive a legal rule which can be applied to attain predictable results."

294 Or at 106. Accordingly, even "[w]here actual exercise of control is shown to exist, improper conduct must also be demonstrated." *Id.* at 107; *see also Schlecht v. Equitable Builders*, 272 Or 92, 97-98, 535 P2d 86 (1975) ("Authorities from other jurisdictions agree that some form of moral culpability on the part of the parent corporation is required before the parent will be held liable for a debt of its subsidiary."). In *Amfac Foods*, the court provided a number of examples of conduct that is "improper" for purposes of piercing the corporate veil: inadequate capitalization; milking through payment of excessive dividends; misrepresentation by the shareholders to the creditors; confusion or commingling of assets; holding out of the respective entities to the public as a single enterprise; and violation of statutes for the purpose of evading federal or state regulation. 294 Or at 109-10. However, the court cautioned that the "foregoing examples are just that, examples." *Id.* at 110.

■ Although the listed examples are not the only types of improper conduct that may support a veil-piercing claim, two common threads connect them. First, in each example, the "improper conduct" has an aspect of moral culpability. *Id.* "[S]ome form of moral culpability on the part of the parent corporation is required before the parent will be held liable for [a] debt of its subsidiary." *Id.* at 108 (quoting *Schlecht*, 272 Or at 97-98). Second, the improper conduct must be of a type that manipulates or abuses the corporate form in some way,

thereby drawing funds away from the debtor corporation or conferring a benefit on the party sought to be charged. *Amfac Foods*, 294 Or at 109-12.

In this case, the trial court specifically concluded that SNIC and CCCC had engaged in improper conduct with respect to their security deposits:

"Respondents [SNIC and CCCC] also clearly and deliberately violated ORS 731.628 in an attempt to secure a business advantage. In doing so, Respondents put their own financial interests first, with full knowledge that they were putting Oregon policyholders at risk for millions of dollars by doing so. Clearly, Respondents' conduct was not only illegal, but also improper."

According to defendants, the improper conduct that the trial court identified was the " 'violation of ORS 731.628,' apparently by [Superior Group], in 'transferring the existing BICO deposit assets to SNIC, but then renewing all BICO policies and incurring new liabilities with [CCCC].' " Defendants contend that the transfer of BICO assets to SNIC and the renewal of BICO policies with CCCC were actuated by lawful business purposes and did not violate ORS 731.628.

OIGA frames the putative "improper conduct" differently. OIGA argues that Levine, the accounting manager for both SNIC and CCCC, "knew the deposits were due in March, but did not submit them even after repeated inquiry by the Oregon Insurance Division." Thus, when Levine asked the division for a refund of SNIC's deposit in August 2000, "he knew that CCCC owed a $6.5 million deposit, but deliberately did not reveal that deficiency to the Oregon Insurance Division." Based on that conduct, OIGA argues that "SNIC/CCCC tried to deceive the Oregon Insurance Division and the people of Oregon."

To properly analyze defendants' conduct, it is necessary to consider, in greater detail, the statutory requirements for Schedule P deposits. As discussed, ORS 731.628 requires workers' compensation insurers to post Schedule P deposits "for the payment of compensation benefits[.]" ORS 731.608(3). The amount of a required deposit is based on the insurer's risk in Oregon and is computed by reference to the

business history of the insurer. ORS 731.628(1).[9] The Schedule P filings, calculated as of the preceding December 31, must be made with the insurance division by March 1 of each year. Any adjustments to the requisite deposits are then due by March 31 of the current year.

■ It is undisputed that CCCC failed to make its required Schedule P deposit for 1999; the question is whether SNIC should answer for that failure as a result of its "improper conduct." Though licensed in Oregon, CCCC does not appear to have written significant Oregon workers' compensation business until 1999. The shortfall in the deposit liability arose as a result of business that was written by CCCC in 1999. CCCC's 1999 business included the renewal of policies that were previously written by BICO, a company that was part of the Superior Group companies until December 1998. When Superior Group sold BICO as a shell in December 1998, it agreed to remain responsible for pre-1999 BICO liabilities. It did that by posting more than $10 million in security deposits with SNIC, as retrocessionaire of the pre-1999 BICO liabilities. Although SNIC initially reinsured risks for pre-1999 BICO claims, that liability was commuted by a separate agreement with BICO in December 1999. Henceforth, the Schedule P deposit requirements for the pre-1999 BICO risks (which had been covered by SNIC's deposit) were to be made by BICO. The evidence showed that those deposits were in fact made by BICO.

OIGA argues that "[t]he renewal of BICO policies onto CCCC paper is the root of the Schedule P deposit deficiency that is the subject of this case." The trial court similarly concluded that CCCC and SNIC violated ORS 731.628 by "transferring the existing BICO deposit assets to SNIC, but then renewing all BICO policies and incurring new liabilities with [CCCC]." On *de novo* review, we do not find adequate factual support in the record for the premise that the

---

[9] In essence, the amount of the deposit is calculated as the aggregate of (1) a valuation of estimated future loss and payments for claims more than three years old and (2) a valuation of premiums earned less loss and loss expense payments for the preceding three years. ORS 731.628(1)(b). For purposes of this opinion it is unnecessary to delve further into the intricacies of the formula.

renewal of the BICO policies with CCCC—and the corresponding transfer of assets to SNIC—was designed to avoid CCCC's Schedule P deposit liability or otherwise was improper.

The conduct that is at the heart of this case is not the renewal of the BICO policies on CCCC paper; it is the failure of CCCC to comply with its Schedule P obligations with respect to those policies. BICO was not a part of Superior Group when the BICO policies were renewed; it had been sold as a shell company in December 1998. Thus, there was a legitimate business reason for renewing policies with CCCC, a Superior Group company, rather than BICO. Although the decision to renew those policies with CCCC came from the "home office," there was no evidence that CCCC expected to default on those policies when they were renewed or that the Superior Group believed that it would do so. In the absence of evidence that CCCC acted improperly to cause the result that plaintiff complains of, plaintiff cannot prevail on its veil-piercing theory. *See Amfac Foods*, 294 Or at 110. For workers' compensation insurance written in 1999, CCCC was required to make any adjustments to its Schedule P deposits by March 31, 2000. Neither SNIC nor CCCC filed Schedule P calculations on March 1, and CCCC never made its required security deposit. Standing alone, however, CCCC's failure to make a security deposit under ORS 731.628 is not the type of conduct that would justify the extraordinary remedy of piercing the corporate veil.

Although OIGA suggests that the failure to pay the deposit was part of a broader fraudulent scheme to benefit other Superior Group companies, the evidence does not support that inference. OIGA's fraud theory focused on the fact that SNIC ultimately filed a late Schedule P form (after prodding from the division) and requested a refund of SNIC's excess deposit without simultaneously filing a Schedule P showing CCCC's deficit. It is true that Levine testified that "the powers that be were interested in getting money back, not giving money to somebody else." Moreover, with respect to the late filing and request for SNIC's refund, defendants initially were not forthcoming about their respective deposit obligations. However, because SNIC's obligation did not

extend to CCCC liabilities and CCCC did not take a credit on its Schedule P forms for any deposits posted by SNIC, there was nothing "improper" about SNIC's refund request.[10] Because, at a minimum, OIGA failed to prove the improper conduct element of its veil-piercing claim, the trial court erred in entering judgment for OIGA on that claim.

## B. *The Pooling Agreement Theory*

As discussed, the trial court did not rest its decision solely on a traditional veil-piercing theory. In addition, the court determined that, "under [Superior Group's] formal intercompany Pooling Agreement, SNIC is the reinsurer of [CCCC]. Because a reinsurer's deposit may legally be used to pay a ceding insurer's compensation claims, SNIC's deposit may be used to pay [CCCC's] claims. ORS 731.608(3), [ORS] 731.628(1)(b)."[11] That theory of liability was added to OIGA's pleading by a post-trial amendment. OIGA argues that the issue was tried by consent; defendants reply that they did not so consent and that, in any event, the pooling agreement did not make SNIC a reinsurer of CCCC. We address those issues in turn.

ORCP 23 governs the amendment of pleadings. ORCP 23 B provides:

"When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the

[10] On appeal, OIGA advances a number of alternative equitable and statutory bases for disregarding defendants' corporate forms. Those theories were not pleaded and, although questions by OIGA's counsel addressed them, the theories do not appear to have been tried by consent. We reject them without further discussion.

[11] OIGA pleaded this theory as a second veil-piercing count. On appeal, OIGA makes no serious effort to defend that characterization. Rather, as elaborated in greater detail below, we understand the theory actually to concern the construction and legal effect of a contract.

pleadings to be amended when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice such party in maintaining an action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence."

The pooling agreement was admitted into evidence on the first day of trial, through the testimony of Albert Latham, a division representative. He described the agreement "in layman's terms" as an agreement wherein "a group of insurance companies * * * are going to cede or transfer business into a pool, and then each company is * * * going to take a certain amount of that insurance risk back from the pool." Latham did not have any personal knowledge regarding the formation of the pooling agreement, and he did not testify as to its meaning or legal effect.

After Latham had testified on other topics, the trial court returned to the issue of the pooling agreement and expanded the inquiry beyond the issue of common control. The court asked, "Well, this goes well beyond simply a reinsurance transaction, doesn't it?" The court continued, "And would * * * normally you be—it looks to me like paragraphs 2 and 3 effectively make [SNIC] responsible not only for 22 percent of [CCCC's] claims, but 22 percent of everybody's claims."[12]

The trial court later returned to the subject of the pooling agreement in a colloquy with defendants' counsel. At that point, the concept of the pooling agreement as a basis for SNIC's liability began to take shape. The following colloquy occurred:

"THE COURT: But if in May of '99, the deposit for SNIC reflected CalComp liability, I don't think that you can then limit that liability to 22 percent through the retrocede

---

[12] The court was particularly interested in the impact that the pooling agreement would have had on the Schedule P filing, specifically whether the Schedule P should have reflected that SNIC reinsured not only 22 percent of CCCC's claims but "22 percent of everybody's claims." Latham testified that the Schedule P should have reflected reinsurance by SNIC of "22 percent of everybody's claims." On cross-examination, Latham clarified his opinion, testifying that Schedule P filings reflect only reinsurance of Oregon business, not reinsurance of nationwide business.

transfer because it covers not only SNIC, which has the 22 percent of the ultimate liability, but it also covers CalComp, which has 100 percent of the original liability.

"[COUNSEL]: It has 100 percent of the original liability for the business that was written by [CCCC] under that agreement, and not * * * for this separate quota share liability.

"* * * * *

"THE COURT: Then I think you're on the hook aren't you?

"[COUNSEL]: No.

"THE COURT: * * * [T]hat's what you're going to have to explain to me."[13]

---

[13] The theory was further developed during the testimony of Neinow. At that point, the court essentially asked whether, under the pooling agreement, all liabilities of CCCC were assumed by CalComp. Nienow responded that they were. The court then asked why, if SNIC's Schedule P covers the liability of SNIC on BICO policies, the Schedule P does not also cover those liabilities that "flow to CalComp through [CCCC]."

The court again addressed the subject of the pooling agreement during the testimony of Loslo Komjathy, an attorney with the Conservation and Liquidation Office of the California Department of Insurance:

"THE COURT: Basically, all of the liability—all of the risk went into a bucket, and each of these * * * companies that were retroceded, the risk from that bucket just shared in it 22 percent?

"[WITNESS]: That's the way I understand it; that all of the * * * original policies written by [CCCC] or CalComp—well, all of [CCCC], they were all ceded to [CalComp], and then in addition to the ceded policy obligation, the [CalComp] written polices, then were—to the extent it was [CalComp], it would have been just ceded. And as to the rest of them, it would have been retroceded.

"THE COURT: Okay. But once it's mixed in the bucket, it's kind of like pouring milk and cream and chocolate milk and water all together?"

After further discussion, the court informed the parties:

"And I think—at least my preliminary conclusion is, SNIC's responsible for 22 percent of CalComp's liability from whatever source derived, rather than just [CCCC's] liability.

"* * * * *

"* * * If SNIC owes it and Oregon has the deposit securing SNIC's obligation, it would appear to me that [OIGA] can call upon SNIC's pledged assets to satisfy SNIC's obligations to SNIC through [CalComp] under the pooling agreement. As long as it doesn't ask SNIC to pay 22 percent of [CalComp's] obligations."

■ Defendants' counsel did not object to the court's inquiries at any stage of the proceeding, nor did defendants argue that the evidence adduced by the court's questions exceeded the scope of the pleaded issues in the case. After trial, the parties submitted written closing arguments. In a reply argument, OIGA moved to amend its pleading to include an additional theory based on the construction and legal effect of the pooling agreement and the trial court's line of questioning. The proposed new count alleged as follows:

"19A.

"SNIC and CCCC, and their predecessors and affiliated companies, entered into a Pooling Agreement whereby each company transferred and assumed an indivisible share of the national business of the combined companies. Under that Pooling Agreement, SNIC is a 100% reinsurer of CCCC's Oregon business. As such, its deposit may be applied to CCCC's Oregon claims under ORS 731.608 and ORS 731.628."

Defendants objected, but the trial court granted OIGA's motion. We review that ruling for an abuse of discretion. *See, e.g., Brasch v. Quan*, 162 Or App 472, 476, 986 P2d 1183 (1999) (applying abuse of discretion standard to review of ruling under ORCP 23 B).

■ Here, the issues framed by the amended pleading were tried by the parties with the encouragement of the trial court, and they were fully addressed by the evidence and arguments at trial. In response to the court's inquiries regarding the meaning and legal effect of the pooling agreement, defendants offered their own evidence on those matters through testimony by Nienow and Komjathy. Defendants' counsel recognized the trial court's concern about the pooling agreement, attempting at times to correct the court's understanding of that agreement. Near the close of trial, defendants' counsel remarked that the court was concerned with a "breach of contract" issue regarding the pooling agreement and that he was "not sure it's a piercing-the-corporate-veil issue." At no point, however, did defendants object to questions regarding the effect of the pooling agreement—either from OIGA's counsel or the court—on the ground that those issues were outside the scope of the pleadings. Given

defendants' willingness at trial to address both the evidentiary and legal issues raised concerning the pooling agreement and the evidence in the record offered by OIGA and defendants, we conclude that the issues raised by the challenged amendment concerning the meaning and legal effect of the pooling agreement were tried by implied consent. *See Smith v. Wallowa County*, 145 Or App 341, 345, 929 P2d 1100 (1996). Accordingly, the trial court did not abuse its discretion by granting OIGA's motion to amend the pleadings to add a theory of liability based on the pooling agreement.

■ Turning to the merits, the issue is whether the pooling agreement made SNIC a "reinsurer" of CCCC within the meaning of ORS chapter 731. OIGA relies on a number of statutes, which, it concludes, "expressly provide that a reinsurer's deposit may be used to pay a ceding insurer's compensation claims." Among those statutes, ORS 731.608(3) provides that, "[d]eposits made by insurers *and reinsurers* in this state under ORS 731.628 shall be held for the payment of compensation benefits to workers employed by insured employers * * *." (Emphasis added.) In addition, ORS 731.648(1)(b) provides that, "[i]f the deposit was required of a reinsurer under ORS 731.628, the deposit shall be held as long as there is outstanding any liability of the reinsurer with respect to which the deposit was made." According to OIGA, those statutes do not distinguish between reinsurers and retrocessionnaires. It follows, OIGA reasons, that SNIC's deposit assets must be made available to cover CCCC's liabilities. We disagree.

Although not discussed by the parties, ORS chapter 731 defines the term "reinsurance." ORS 731.126 provides that " '[r]einsurance' means a contract under which an originating insurer, called the 'ceding' insurer, procures insurance for itself in another insurer, called the 'assuming' insurer or the 'reinsurer,' with respect to part or all of an insurance risk of the originating insurer." Contrary to OIGA's view, as pertinent here, that definition does distinguish between reinsurers and retrocessionnaires. A "reinsurer" is defined with reference to the contractual relationship between an originating (ceding) insurer and the assuming insurer. That definition does not address indirect obligations between ceding insurers and retrocessionaires, and we are not authorized to expand it

to do so. *See* ORS 174.010 (in construing a statute, courts are "not to insert what has been omitted, or to omit what has been inserted").

Under the terms of the pooling agreement, SNIC was not a "reinsurer" of CCCC. The pooling agreement provides:

"2. CBIC, CC[C]C, SNIC and SPCC hereby cede and transfer, and CalComp hereby reinsures and assumes, all 'losses' and 'expenses' incurred under all insurance policies to which this Agreement applies. Such 'losses' and 'expenses' combined with all 'losses' and 'expenses' of CalComp under insurance policies written by it to which this Agreement applies, shall constitute the pooled business."

Thus, CalComp was the reinsurer of both CCCC and SNIC. In turn, under the agreement, CalComp "retrocede[d] and transfer[red] to CBIC, CC[C]C, SNIC, and SPCC, respectively, and CBIC, CC[C]C, SNIC, and SPCC, respectively, hereby reinsure[d] and assume[d] from CalComp, their applicable percentage of the pooled business." As a consequence, both CCCC and SNIC agreed to reinsure CalComp. Nowhere in the pooling agreement did SNIC agree to reinsure CCCC. Thus, SNIC did not assume CCCC's obligation to post a security deposit by the terms of the pooling agreement.[14] It follows that the trial court erred in granting relief to OIGA on its pooling agreement theory.

## C. The Breach of Contract Claim

Finally, both parties devote portions of their briefs to OIGA's breach of contract claim relating to the alleged settlement agreement. However, the trial court did not reach that claim in its decision. Because much of the evidence regarding the terms of the alleged agreement consisted of conflicting

[14] The trial court assumed that, if SNIC agreed to be the reinsurer of CCCC under the pooling agreement, the security deposit would be available to satisfy CCCC's obligations even if SNIC never agreed to post the deposit on behalf of CCCC. The trial court reasoned that, "[h]aving failed to file Schedule P calculations and deposits as required by law, [defendants] should not now be entitled to designate, after the fact, what credits should be applicable to which entity in order to best shelter their owners and shareholders." Because defendants do not take issue with that aspect of the trial court's reasoning, we do not discuss it further.

testimony given by Nienow, Nicoloff, and others regarding their respective intentions and understandings during settlement negotiations and the meaning of certain e-mails and other documents, an opportunity to observe the demeanor of those witnesses would be of substantial benefit to the trier of fact. For that reason, we decline to reach the breach of contract theory in the first instance on *de novo* review. *See Church v. Woods*, 190 Or App 112, 119, 77 P3d 1150 (2003) ("Although we review factual issues *de novo*, we prefer to give the trial court an opportunity to make findings on [an issue requiring assessment of the witnesses' credibility] in the first instance."). Instead, we remand that claim to the trial court for decision.

Reversed and remanded.