Argued and submitted May 3, decision of Court of Appeals reversed;
judgment of circuit court affirmed November 29, 2007

STATE ex rel Mary NEIDIG,
Director,
Department of Consumer and Business Services,
*Petitioner,*

*and*

OREGON INSURANCE GUARANTY ASSOCIATION,
an association,
*Petitioner on Review,*

*v.*

SUPERIOR NATIONAL INSURANCE COMPANY,
a California corporation,
and Commercial Compensation Casualty Company,
a California corporation,
*Respondents on Review.*

(00C-18554; CA A124825; SC S54315)

173 P3d 123

435-a

John L. Langslet, of Martin Bischoff Templeton Langslet & Hoffman LLP, Portland, argued the cause and filed the brief for petitioner on review. With him on the brief was Justin M. Thorp.

James N. Westwood, of Stoel Rives LLP, Portland, argued the cause and filed the brief for respondents on review.

BALMER, J.

**BALMER, J.**

This ancillary receivership action concerns a $10.6 million deposit that an insurance company made with the Department of Consumer and Business Services (DCBS). The case presents the issue whether DCBS may use the statutory deposit of one insurer to satisfy the statutory liabilities of another insurer that has become insolvent. Our resolution of that issue in this case requires us to consider three legal questions: first, whether an insurer that indirectly reinsures another insurer—by reinsuring the insurer's direct reinsurer and therefore acting as a "second-level" reinsurer—is a "reinsurer" for the purposes of the insurance code, making its statutory deposits subject to control by DCBS; second, whether DCBS may use the deposits of a reinsurer to pay the claims of the insolvent insurer even though neither the insurer nor the reinsurer had indicated to DCBS that the reinsurer's deposits were intended to cover the insurer's liabilities; and, third, whether an insurer's violation of the insurance code justifies piercing the corporate veil between the insurer and another insurer that is under common ownership and control with the first insurer.

The trial court concluded that the deposit was available to DCBS to pay the obligations of the insolvent insurer. The Court of Appeals reversed. *State ex rel Neidig v. Superior National Ins. Co.*, 208 Or App 1, 144 P3d 1030 (2006). For the reasons set out below, we reverse the decision of the Court of Appeals and affirm the judgment of the trial court.

## I. BACKGROUND

In reviewing a decision of the Court of Appeals that is an appeal from a suit in equity, this court may review *de novo* or may limit its review to questions of law. ORS 19.415(4); *see O'Donnell-Lamont and Lamont*, 337 Or 86, 89, 91 P3d 721 (2004), *cert den*, 543 US 1050 (2005) (recognizing court has that choice, electing to review child custody proceeding *de novo*). In this case, as in *O'Donnell-Lamont*, we elect to review the record *de novo*, because we conclude that the Court of Appeals erred in some respects in determining the legal issues that must be addressed and that, once they

are identified, those legal issues require additional or different factual findings. In the interest of a prompt resolution of this case, we address those factual issues, rather than remanding to the Court of Appeals or the trial court for further proceedings in that regard. As our discussion will make clear, however, we appreciate the close attention that the trial court and the Court of Appeals gave to the factual and legal issues in this complex case, and we agree with many of their findings and conclusions.

A.  *Context: Required Deposits by Insurance Companies*

A brief discussion of the regulatory scheme for private workers' compensation insurers will establish the legal context for the factual details and procedural history of this case. Every workers' compensation insurer in Oregon (other than the State Accident Insurance Fund Corporation) must post certain deposits with DCBS. ORS 731.628. Those deposits, known as "Schedule P" deposits, are based on the premiums earned by the insurer and the insurer's loss experience in Oregon. Every workers' compensation insurer must make a deposit of at least $100,000. At the beginning of each calendar year, each insurer calculates its required Schedule P deposit based on a formula that includes the insurer's premium revenue and loss experience through the end of the last calendar year and, if necessary, makes an additional deposit. ORS 731.628(1)(b). The insurer must file the Schedule P form showing that calculation by March 1 of each year and make any additional required deposit by March 31. The deposits are intended to cover the insurer's obligations under the policies that it has written in Oregon. They are intended to ensure that, if the insurer becomes insolvent and is unable to pay claims, DCBS will be able to pay any claims brought under those policies. ORS 731.608(3).

An insurer may reduce the amount otherwise required for its Schedule P deposit if it reinsures a portion of its liability with another insurer (the "reinsurer") and the reinsurer makes a deposit with DCBS. ORS 731.628(1)(b). In that circumstance, the insurer may take a credit against its required deposit in the amount of the deposit that the reinsurer makes. ORS 731.628(3). As a result, the deposits made

by an insurer and any reinsurers must add up to the total amount required by the formula set out in ORS 731.628(1)(b).

B. *Superior Group's Acquisition of Insurance Companies Doing Oregon Business*

This case arises out of the insolvency of defendant Commercial Compensation Casualty Company (CCCC) and other insurance companies under common ownership with CCCC.[1] On *de novo* review, we find the following facts. In 1998, Superior National Insurance Group, Inc. (Superior Group), an insurance holding company, acquired several commonly owned insurance companies, including CCCC, California Compensation Insurance Company (CalComp), and Business Insurance Company (BICO). Under the prior owner, CCCC had written few policies in Oregon, while BICO had substantial workers' compensation insurance business in the state. Superior Group, in turn, sold BICO's name and its certificate to write workers' compensation insurance in Oregon, but not BICO's assets or liabilities, to an unrelated company, Centre Insurance Group (Centre).

To remove BICO's assets and liabilities before that sale, Superior Group transferred the assets to another company owned by Superior Group, defendant Superior National Insurance Company (SNIC). Those assets included $10.6 million in securities that BICO previously had deposited with DCBS in connection with the workers' compensation insurance policies that it had issued in Oregon, as required by Schedule P and ORS 731.628. As to BICO's liabilities, another Superior Group subsidiary, CalComp, agreed to reinsure all of BICO's pre-1999 liabilities, *i.e.*, those based on the policies that BICO had written in Oregon before 1999. CalComp, in turn, reinsured its own reinsurance obligation as to those liabilities with its affiliated company, SNIC.

In May 1999, BICO and SNIC reported those transfers and agreements to DCBS on their respective Schedule P forms. Superior Group's cover letter stated that "SNIC is the ultimate 100% reinsurer [of BICO's pre-1999 liabilities]," and

---

[1] During some of the events described here, CCCC was named Commercial Compensation Insurance Company. For consistency, we use the designation "CCCC" throughout this opinion.

BICO's Schedule P form noted that "[SNIC] through [Cal-Comp]" was the reinsurer of those liabilities.[2] Thus, as of May 1999, SNIC owned the $10.6 million deposit that had been made with respect to BICO's pre-1999 liabilities and also was the ultimate reinsurer of those liabilities.

In December 1999, the Superior Group companies entered into a second transaction with Centre, the company that had purchased BICO. The Superior Group companies made certain payments to Centre (as part of a much larger transaction) and Centre, in turn, agreed to release Cal-Comp's and SNIC's reinsurance obligations with respect to the pre-1999 policies issued by BICO (with the exception of any liabilities in excess of $180 million). In that transaction, Centre also agreed to, and did, deposit securities with a market value of $10.2 million with DCBS to cover the pre-1999 liabilities that it had assumed. As a result, SNIC's $10.6 million deposit no longer was required under ORS 731.648 because SNIC no longer had any obligations with respect to the pre-1999 policies, except in the unlikely event that claims under those policies exceeded $180 million.

## C.  *The Pooling Agreement*

In 1999, but with an effective date of December 31, 1998, CCCC, CalComp, SNIC, and two other insurers owned by Superior Group entered into what they denominated an intercompany pooling agreement (the "pooling agreement"). The agreement was signed on behalf of each of the five signatory companies by the same individual, J. Chris Seaman, who was the executive vice president and chief financial officer of each company. Each company was owned, directly or indirectly, by Superior Group and each had identical officers and directors (except for the formality that one New York resident served on CCCC's board, but not on the other boards, because CCCC had been domesticated in New York).

The pooling agreement covered all workers' compensation insurance policies written by the five companies. It

---

[2] It is noteworthy that SNIC disclosed its reinsurance obligations with respect to BICO's pre-1999 liabilities in its May 1999 Schedule P filing, yet never disclosed to DCBS the reinsurance obligations that it undertook with respect to CCCC's 1999 and 2000 liabilities, as discussed further below.

had two primary effects. First, the four parties other than CalComp agreed to "cede and transfer" all the losses and expenses related to those policies to CalComp, and CalComp agreed to "reinsure[ ] and assume[ ]" all those losses and expenses. Second, CalComp then agreed to "retrocede[ ] and transfer[ ]" *back* to the other four companies, and each of those companies agreed to "reinsure and assume from Cal-Comp," an agreed-upon percentage of the pooled business.[3] Those percentages were based on the relative financial surplus of each company at the time the agreement was signed, as set out in the agreement, and the pooling agreement provided that they could change each year depending on the changing financial surplus of each company.

For 1999, CalComp's percentage of the "pooled business" was 62 percent, SNIC's was 22 percent, and CCCC's was two percent. (The other two commonly controlled companies, neither of which is involved in the issues here, had the remaining 14 percent.) The net effect of the pooling agreement, as it relates to this case, was that CalComp agreed to reinsure 100 percent of CCCC's losses and expenses, and SNIC agreed to reinsure 22 percent of CalComp's reinsurance obligations, including CalComp's reinsurance of CCCC.

Schedule P states that "[i]f a workers' compensation pool is used, [the filing insurer or reinsurer] must list participants and their corresponding amounts" and it requires a filing insurer or reinsurer to identify "ceding companies and reserves." However, neither CCCC nor SNIC ever disclosed the pooling agreement to DCBS on their Schedule P forms or in any other way.

D. *Insurance Operations and Schedule P Filings*

Following the sale of the BICO name and certificate of authority, CCCC began to write more workers' compensation insurance in Oregon, including renewals of policies that BICO had written before 1999. Because of its limited business in Oregon before 1999, CCCC had deposited only $445,000 with DCBS, and only $185,000 of that amount was

---

[3] We discuss below the meaning of "reinsure," "retrocede," and other terms in the pooling agreement.

a deposit for its workers' compensation business, the rest of the deposit being related to other forms of insurance business that it conducted within Oregon. CCCC's Schedule P for 1998, filed in March 1999, indicated that its required deposit for workers' compensation insurance was only $130,000. During 1999 and 2000, however, CCCC increased its Oregon business, earning premiums of about $5.1 million in 1999 and $3.6 million in the first half of 2000. CCCC, however, did not file a Schedule P for 1999 when it was due in March 2000 and never made any additional deposit.

DCBS wrote to CCCC in March 2000 asking the company to file its Schedule P, but CCCC failed to respond. DCBS again wrote to CCCC in August 2000, and again received no response.[4] CCCC continued to write workers' compensation insurance policies in Oregon until August 18, 2000. In October 2000, after CCCC had become insolvent, as discussed below, CCCC, in connection with discussions with DCBS over the liabilities of CCCC and its affiliated insurers, finally filed a Schedule P for 1999 and a separate Schedule P for the period ending June 30, 2000. The latter Schedule P calculated CCCC's deposit requirement as of June 30, 2000, to be $6.6 million. CCCC did not make any deposit to cover that obligation, and CCCC did not identify SNIC's deposit as a "credit" for that obligation.

For its part, SNIC filed a Schedule P for 1998 in May 1999. That schedule reflected SNIC's ownership of the $10.6 million deposit that had been transferred from BICO to SNIC. However, like CCCC, SNIC did not file a Schedule P for 1999 when that form was due in March 2000. In August 2000, Stewart Levine, the statutory accounting manager for both CCCC and SNIC, sent a letter to DCBS enclosing a Schedule P for SNIC for 1999. That form indicated that SNIC had received no premiums, paid no losses, and conducted no workers' compensation insurance business in Oregon. The form failed to disclose the pooling agreement or to indicate that, because of the pooling agreement, SNIC was a second-level reinsurer for CCCC. The form calculated that SNIC's

---

[4] There also is evidence in the record that DCBS communicated with CCCC regarding its unfiled Schedule P in May, June, and July.

required deposit was the statutory minimum of $100,000 that was required to do business in Oregon. Levine's letter noted that SNIC had an existing deposit of $10.4 million,[5] and it requested that DCBS release those funds (except for the required $100,000 minimum deposit) to SNIC.

DCBS rejected SNIC's request and demanded that SNIC and all of its affiliated companies submit Schedule P forms indicating their liabilities as of June 30, 2000. Although Levine did not mention anything about CCCC to DCBS in connection with his efforts to recover the SNIC deposit, in an internal Superior Group memo prepared in connection with DCBS's request he wrote: "Superior National—Oregon owes us $10,293,957. Commercial Compensation [*i.e.*, CCCC]—We owe Oregon $6,570,498. These calculations are as of June 30, 2000."

E. *Insolvency and Bankruptcy*

The reason that CCCC and SNIC both had failed to file their required Schedule P forms in March 2000 became apparent to DCBS later in the year. In March 2000, the California Department of Insurance had placed SNIC, CalComp, and several of Superior Group's other insurance subsidiaries into conservatorship because of the precarious financial position of some of those companies.[6] In late April 2000, Superior Group entered federal bankruptcy proceedings. In September 2000, a California court ordered the liquidation of the assets of CCCC, SNIC, and the other Superior Group insurance companies.

## II. LEGAL PROCEEDINGS

A. *Commencement of the Action and Pre-trial Orders*

DCBS brought this ancillary receivership action against CCCC and SNIC (the two Superior Group subsidiaries

---

[5] The deposit at issue in this case consisted of marketable securities with a face value of $10.6 million. The market value of the securities fluctuated, and the parties sometimes gave the market value, rather than the face or book value, of the securities. Those differences are not relevant to the issues in this case.

[6] As noted previously, CCCC had been domesticated in New York and, because of the timing of its change of domestication to California, California regulators did not formally place CCCC into conservatorship until June 9, 2000. However, CCCC operated as if under conservatorship after March 2000.

authorized to conduct insurance business in Oregon) in October 2000, soon after the liquidation order was entered by the California court. *See* ORS 734.200 (authorizing court to direct DCBS director to take possession of Oregon property of foreign insurer, to appoint director as ancillary receiver, and to order liquidation of foreign insurer's Oregon assets); ORS 734.190 (authorizing DCBS director to apply for court order directing conservation of Oregon assets of foreign insurer). At that time, as noted, SNIC had on deposit the $10.6 million related to workers' compensation insurance and reinsurance, and CCCC had on deposit $185,000 related to its workers' compensation insurance business and $260,000 related to its other Oregon insurance business. Defendants did not enter an appearance or contest the appointment of the receiver, and the trial court entered an order appointing the DCBS director as ancillary receiver.

After CCCC was declared insolvent in September 2000, the Oregon Insurance Guaranty Association (OIGA) assumed responsibility for administering claims and paying covered claims on workers' compensation insurance policies that CCCC had issued. *See* ORS 734.510 to 734.710 (establishing OIGA and setting out its authority). From January 1 through July 31, 2001, OIGA paid about $2.6 million for claims and expenses related to CCCC's policies. After the California Department of Insurance revealed the existence of the pooling agreement to DCBS in June 2001, DCBS sought, and the trial court issued, in September 2001, an order releasing funds from SNIC's Schedule P deposit to reimburse OIGA for part of those payments. DCBS asserted that SNIC had agreed in the pooling agreement to reinsure 22 percent of CCCC's business. The trial court order authorized DCBS to disburse $585,233 (22 percent of the amount that OIGA already had paid out) from the SNIC deposit to OIGA and also to disburse to OIGA, on an ongoing basis, 22 percent of the amounts that OIGA continued to pay on CCCC's policies.[7] CCCC and SNIC did not appear in opposition to the DCBS motion.[8]

---

[7] The order also authorized DCBS to transfer to OIGA the $185,000 deposit that CCCC had made with respect to its workers' compensation insurance business.

[8] Nor did defendants, on appeal, assign error to the trial court's order regarding the 22 percent payments.

In December 2001, OIGA filed a motion to intervene in the ancillary receivership action, which the trial court granted. After OIGA's intervention, OIGA, rather than DCBS, maintained this action. OIGA's petition on intervention claimed that the SNIC deposit should be available to reimburse OIGA for *all* of its payments to CCCC's insureds, rather than only the 22 percent of the OIGA payments that the trial court had authorized in its September 2001 order. Among other things, OIGA asserted that the court should treat CCCC and SNIC as the same entity and make SNIC's deposit available to cover claims on CCCC's policies as if the deposit had been made by CCCC. CCCC and SNIC answered the petition on intervention, denying the operative allegations.

## B. *Rulings Below*

Following a bench trial, the trial court concluded that SNIC was liable for all of CCCC's Oregon workers' compensation insurance losses and expenses. The trial court held that SNIC had agreed to provide reinsurance to CCCC in the pooling agreement and that, as a reinsurer, SNIC's $10.6 million deposit was available to cover CCCC's liabilities under ORS 731.608(3). The court also found that SNIC and CCCC were commonly controlled, that those companies' violations of Oregon statutes warranted piercing the corporate veil, and that SNIC's assets, including the deposit, were available to satisfy CCCC's Oregon insurance obligations.[9]

Defendants appealed, and the Court of Appeals reversed on both grounds. The Court of Appeals concluded that, under the pooling agreement, SNIC was not a "reinsurer" of CCCC. *Neidig*, 208 Or App at 18-23. Rather, in its

---

[9] Because the trial court ruled for OIGA on the two theories discussed, it did not reach a breach of contract claim that OIGA had asserted. That claim was based on settlement discussions between DCBS and defendants. OIGA contended that the parties had reached an agreement under which defendants would transfer $6.6 million from SNIC's deposit to satisfy CCCC's deposit obligation and that defendants had breached that agreement. The Court of Appeals, having reversed the trial court's judgment, remanded the breach of contract claim to the trial court for decision. *Neidig*, 208 Or App at 24. Because we reverse the Court of Appeals decision and affirm the judgment of the trial court, we do not discuss the breach of contract claim.

view, CalComp was a reinsurer of CCCC, and SNIC was a reinsurer of CalComp. The Court of Appeals noted that a reinsurer of a reinsurer—a second-level reinsurer such as SNIC in this case—sometimes is referred to as a "retrocessonaire." *Id.* at 5 n 3. As we describe in greater detail below, the Court of Appeals determined that ORS 731.608(3), which authorizes DCBS to use the statutory deposits of "insurers" and "reinsurers" to pay claims related to insolvent insurers, did not authorize DCBS to use the assets of SNIC, a retrocessionaire, to pay claims on behalf of CCCC.

The Court of Appeals also rejected OIGA's veil-piercing theory. The court held that one requirement for piercing the corporate veil was that the party whose assets are being claimed must have engaged in improper conduct that "has an aspect of moral culpability." *Id.* at 14. The court concluded that, although both CCCC and SNIC violated the insurance code by failing to file their Schedule P forms or make security deposits when required, those failures did not rise to the level of misconduct required to pierce the corporate veil. Similarly, the Court of Appeals concluded that the transfer of BICO's deposit to SNIC, rather than to CCCC (which generated premiums by renewing workers' compensation insurance policies initially sold by BICO), was supported by legitimate business reasons and did not demonstrate the kind of manipulative, deceptive conduct that would justify piercing the corporate veil. *Id.* at 15-18.

OIGA filed a petition for review, which we allowed.

## III. ANALYSIS

Because piercing the corporate veil "is an extraordinary remedy which exists as a last resort, where there is no other adequate and available remedy to repair plaintiff's injury," *Amfac Foods v. Int'l Systems*, 294 Or 94, 103, 654 P2d 1092 (1982), we first examine whether plaintiff's legal claim provides an adequate remedy. *See, e.g.*, *City of Salem v. H.S.B.*, 302 Or 648, 655, 733 P2d 890 (1987) (challenges to "corporate form and its limited liability" will not be considered "unless it is demonstrated to be an absolute necessity").

A. *SNIC's Liability as a Reinsurer of CCCC: Definition of "Reinsurer"*

On review, OIGA argues that SNIC's deposit is available to pay CCCC's liabilities because SNIC was a reinsurer of CCCC.[10] As discussed previously, ORS 731.628 provides that workers' compensation insurers must make statutory deposits, and an insurer may take a credit against the required deposit to the extent that it reinsures part of its liability and its reinsurer makes an offsetting deposit. ORS 731.608(3) provides that the Schedule P deposits of both an insurer *and its reinsurers* can be used to pay losses and loss expenses if the insurer becomes insolvent:

> "Deposits made by insurers and reinsurers in this state under ORS 731.628 shall be held for the payment of compensation benefits to workers employed by insured employers * * * to whom the insurer has issued a guaranty contract under ORS chapter 656."

■ OIGA first argues that the deposit at issue here is available to it under ORS 731.648(1)(b), which provides that a required deposit by a reinsurer "shall be held as long as there is outstanding any liability of the reinsurer with respect to which the deposit was made." OIGA also asserts that, under the pooling agreement, CalComp reinsured all of CCCC's liability and SNIC, in turn, reinsured a portion of those liabilities. Therefore, OIGA argues, SNIC is a "reinsurer" of CCCC for purposes of ORS 731.608(3) and ORS 731.628—albeit a "second-level" or indirect reinsurer—and its "deposits" are available to pay the policies that CCCC issued.[11]

For OIGA to prevail on either of those arguments, it first must be correct in asserting that a second-level reinsurer, such as SNIC, is a "reinsurer" for purposes of ORS 731.608(3) and ORS 731.648(1)(b). The Court of Appeals

---

[10] OIGA asserted this claim in a post-trial amendment to conform the pleadings to the evidence at trial. The trial court allowed the amendment of the pleadings, and the Court of Appeals affirmed, concluding that the trial court had not abused its discretion in permitting the amendment. *Neidig*, 208 Or App at 18-22. Defendants did not petition for review of that ruling by the Court of Appeals, and we do not address it.

[11] OIGA also advances two other arguments that do not merit discussion.

rejected OIGA's argument at that threshold level, holding that SNIC was not a "reinsurer" for purposes of those statutes. *Neidig*, 208 Or App at 22-23. We begin with that issue.

Oregon statutes do not provide a definition of "reinsurer," and the Court of Appeals based its conclusion on the statutory definition of "reinsurance." ORS 731.126 provides:

" 'Reinsurance' means a contract under which an originating insurer, called the 'ceding' insurer, procures insurance for itself in another insurer, called the 'assuming' insurer or the 'reinsurer,' with respect to part or all of an insurance risk of the originating insurer."

The Court of Appeals viewed that definition as limiting a "reinsurer" to the "assuming" insurer in a contractual relationship between that insurer and an originating or "ceding" insurer. *Neidig*, 208 Or App at 22. The court concluded, "That definition does not address indirect obligations between ceding insurers and retrocessionaires, and we are not authorized to expand it to do so." *Id.* at 22-23. OIGA argues that the Court of Appeals erred in interpreting "reinsurer" to exclude second-level reinsurers, or retrocessionaires. For the reasons that follow, we agree with OIGA.

ORS 731.126, set out above, itself uses three different terms to refer to an entity that provides reinsurance: "reinsurer," "another insurer," and "assuming insurer." That statute states that the act of "reinsurance" is a transaction in which an insurer cedes some or all of its insurance obligations and risk to "another insurer." Contrary to the Court of Appeals' conclusion, the text of ORS 731.126 does *not* exclude from the definition of "reinsurer" an insurer that provides second-level reinsurance. A "reinsurer" is simply an insurer that engages in a certain kind of insurance—insuring another insurer. Nothing in logic or in ORS 731.126 suggests that the term "reinsurer" should be limited to an insurer that insures another *insurer* and must exclude an insurer that insures a *reinsurer*.

Indeed, as the Court of Appeals noted earlier in its opinion, "The *reinsurer* of a reinsurer is referred to as a retrocessionaire." *Neidig*, 208 Or App at 5 n 3 (emphasis added). Retrocession—second-level reinsurance—has a long history

in the insurance industry, and although the term retrocessionaire sometimes is applied to distinguish second-level reinsurance from a first-level reinsurance, the term "reinsurance" typically refers to both. *See, e.g.*, *Second Russian Ins. Co. v. Miller*, 268 US 552, 554, 45 S Ct 593, 69 L Ed 1088 (1925) ("retrocession * * * is, contracts reinsuring reinsurers"); *Security Ins. Co. of Hartford v. TIG Ins. Co.*, 360 F3d 322, 324 (2d Cir 2004) (retrocession agreement is reinsurance); *ReliaStar Life Ins. Co. v. IOA Re, Inc.*, 303 F3d 874, 876, 878-79 (8th Cir 2002) (examining "retrocessional coverage" as a "reinsurance contract[ ]"); *Transcontinental Underwriters Agency, S.R.L. v. American Agency Underwriters*, 680 F2d 298, 299 nn 1-2 (3d Cir 1982) (using retrocession and reinsurance interchangeably).

For the same reasons, the term "reinsurer" ordinarily includes both first-level reinsurers and second-level reinsurers or retrocessionaires. An example from one treatise illustrates the use of the term "reinsurer" in a discussion of rights among multiple insurers:

> "Reinsurers are free to enter into 'retrocessional agreements' whereby the reinsurer assigns all or a portion of the risk to *another reinsurer*. In other words, such an agreement is reinsurance of reinsurance. Where this occurs, the potential liabilities of the respective *reinsurers* can become more difficult to assess."

Steven Plitt, Daniel Maldonado, and Joshua D. Rogers, 1A *Couch on Insurance 3d* § 9:18, 9-59 (2003) (footnotes omitted) (emphases added).

For those reasons, we conclude that OIGA's claim against the SNIC deposit is not barred simply because SNIC is a second-level reinsurer of CCCC, rather than a direct, or first-level, reinsurer. That conclusion, however, does not necessarily mean that OIGA may recover the SNIC deposit, and we turn to the other statutes and contractual arrangements upon which OIGA's claim is based.

B.  *SNIC's Liability as a Reinsurer of CCCC: SNIC's Deposit and the Insurance Code*

■        As noted above, OIGA first argues that it may recover the SNIC deposit under ORS 731.648(1)(b), which

provides that the deposit shall be held "as long as there is outstanding any liability of the reinsurer *with respect to which the deposit was made.*" (Emphasis added.) That statute does not assist OIGA because the SNIC deposit was not made "with respect to" the CCCC obligations at issue here. Rather, the deposit was made by BICO before Superior Group purchased BICO in 1998 and was made to cover BICO's *pre-1999* insurance obligations. The obligations here are for policies issued by CCCC in 1999 and 2000. Although many of those policies were renewals of BICO's pre-1999 policies, the SNIC deposit was not "made" "with respect to" any SNIC liability (or even any CCCC liability) for those policies, as those terms are used in ORS 731.648(1)(b). Even when the deposit was described in SNIC's May 1999 Schedule P filing, it was designated as a deposit for BICO's pre-1999 obligations, not for CCCC's obligations.

OIGA's second argument is based on the pooling agreement and two statutes, ORS 731.628 and ORS 731.608(3). Although it has various refinements, some of which we discuss below, OIGA's argument, at bottom, is that this court should adopt the trial court's conclusion that SNIC is a reinsurer of CCCC under the pooling agreement and that the cited statutes permit "a reinsurer's deposit [to be] used to pay a ceding insurer's compensation claims." We held above that a second-level reinsurer—a "retrocessionaire"—is a reinsurer for purposes of those statutes. However, we disagree with OIGA's assertion that those statutes allow it to use the SNIC deposit to cover all of the CCCC losses.

ORS 731.628 provides, in part:

"(1)   * * * [E]ach insurer [other than SAIF] that issues guaranty contracts to employers under ORS chapter 656 shall deposit with [DCBS] * * *:

"* * * * *

"(b)   An amount equal to the sum described in this paragraph less credits for approved reinsurance that the insurer may take under subsection (2) of this section. * * *

"* * * * *

"(2)  Before an insurer may take a credit for reinsurance under subsection (1)(b) of this section, the reinsurer must deposit an amount equal to the credit to be taken.

"(3)  An insurer may be allowed the credit referred to in subsection (1)(b) of this section only when the reinsurer has deposited with the department an amount equal to the credit."[12]

That statute describes deposits that an *insurer* that issues guaranty contracts to employers "shall" make. Contrary to OIGA's argument, it does not impose any deposit obligation on a *reinsurer* of an insurer that issues such contracts. Instead, it permits an insurer to pay a smaller deposit *if* a reinsurer *makes a deposit* on behalf of the insurer. An insurer may take credit for reinsurance when its reinsurer makes a deposit, but nothing in that statute requires a reinsurer to make any deposit. Here, it is undisputed that SNIC made no deposit related to its reinsurance of CCCC's liability, and CCCC's Schedule P for 1998 (filed in 1999) does not show CCCC taking any credit for any SNIC deposit.

OIGA urges us to adopt the reasoning of the trial court, which concluded that, because SNIC and CCCC failed to file Schedule P forms in 2000, they "should not now be entitled to designate, after the fact, what credits should be applicable to which entity * * *." OIGA notes that defendants concealed CCCC's deficiency—that is, the Schedule P deposit that should have been made in March 2000—by failing to file a Schedule P when required in March 2000 or to respond to inquiries from DCBS. It is undisputed that, if CCCC had filed an accurate Schedule P when it should have, it would have been required to make a deposit in excess of $4.4 million.[13] Moreover, when *SNIC* filed its Schedule P in August 2000, almost six months after it was due, it did not indicate that it

---

[12] In 2007, the Oregon legislature amended ORS 731.608 and ORS 731.628 by deleting the words "guaranty contract" and "guaranty contracts," and replacing them with "workers' compensation insurance policy" and "workers' compensation insurance policies." Or Laws 2007, ch 241, §§ 26-27. Those changes do not affect our analysis, and we quote the statutes that were in effect at the time the events took place.

[13] CCCC's Schedule P for 1999 (due March 1, 2000) would have showed a required deposit of $4.4 million. CCCC later prepared a Schedule P that covered the policies it wrote through June 30, 2000, and showed a required deposit of $6.6 million.

had any insurance or reinsurance obligations for workers' compensation insurance in Oregon. Instead, SNIC requested return of its $10.4 million deposit on the ground that it was far in excess of any deposit required of SNIC, and it failed to disclose that the pooling agreement obligated SNIC to pay at least some of CCCC's losses. When asked why he filed a Schedule P in August 2000 for SNIC, but not for CCCC, Stewart Levine, the manager of statutory accounting for SNIC, CCCC, and the other Superior Group companies, testified that "the powers that be were interested in getting money back, not giving money to somebody else."

The conduct described above, however, does not permit us to rewrite ORS 731.628 to impose a deposit obligation on a reinsurer. OIGA's argument that that statute somehow imposes such an obligation on every reinsurer is not well taken. Reinsurers may undertake contractual obligations to insurers through pooling agreements or other instruments. A reinsurer could make, or could agree by contract to make, a statutory deposit on behalf of an insurer, although SNIC did not do so here. But ORS 731.628 itself imposes no such obligation.

The pooling agreement and ORS 731.608(3) present a different issue. ORS 731.608(3), as noted previously, provides, in part, "Deposits made by insurers and reinsurers in this state under ORS 731.628 shall be held for the payment of compensation benefits to workers employed by insured employers * * *." OIGA argues that because SNIC is a "reinsurer" under the pooling agreement and the deposit SNIC now owns was made "under ORS 731.628," that deposit is available to pay *all* the CCCC obligations that OIGA has taken over. We disagree.

OIGA's argument ignores the fact that a contract that creates a reinsurance obligation—here, the pooling agreement—also may limit the extent of the reinsurer's liability. Here, that contract provided that CalComp (which is not a party to this case) would reinsure 100 percent of CCCC's "losses" and "expenses." CalComp then agreed to retrocede to SNIC and SNIC agreed to "reinsure and assume from CalComp" 22 percent "of the pooled business." As discussed above, on the basis of the pooling agreement,

ORS 731.628, and ORS 731.648(4), the trial court in September 2001 authorized DCBS to disburse $585,233.57 of the SNIC deposit to OIGA. That amount was 22 percent of the "losses" and "expenses" that OIGA had paid to insureds in connection with CCCC's policies. The September 2001 order further authorized the disbursement of additional amounts to OIGA "representing 22 percent of payments made by the OIGA for [CCCC's] losses and loss expenses." As noted, defendants have not appealed the trial court's September 2001 order.[14]

Here, however, OIGA argues that we should adopt the trial court's conclusion following trial that, under the pooling agreement, SNIC was responsible for 100 percent of CCCC's losses. The trial court summarized the basis for its conclusion as follows:

"The Pooling Agreement did not segregate which individual business liabilities SNIC reinsured, SNIC reinsured each of them 100%, up to a maximum of 22% of the total pool. Accordingly, SNIC's reinsurance obligation can fairly be allocated to any portion of the pooled business that SNIC reinsured, up to 22% of the total pool under the terms of the Pooling Agreement."

Our analysis of the pooling agreement, however, does not support the trial court's conclusion. Contrary to the statement by the trial court, SNIC did not agree in the pooling agreement to reinsure 100 percent of "each" individual "business liabilit[y]." Rather, under the pooling agreement, each of the participating companies agreed to "bear the 'losses' and 'expenses' of the pooled business *according to their applicable percentage of such business.*" (Emphasis added.) The pooling agreement defined "pooled business" as all "losses" and "expenses." It then defined "losses" as "losses incurred on insurance to which this Agreement applies"—workers' compensation insurance policies issued by the participating companies—and "expenses" as "loss adjustment expenses incurred, whether allocated or unallocated," "other

---

[14] Some of defendants' arguments regarding the treatment of the SNIC deposit indirectly challenge the legal basis for the September 2001 order. Because defendants did not object to that order when it was issued (or at any other stage in the trial court proceedings) and did not assign error to the order on appeal, we do not address its validity here.

underwriting expenses," and "general and administrative expenses." Under the mechanism established by the pooling agreement, SNIC, contrary to the trial court's statement, did not agree to pay 100 percent of the "business liabilities" up to 22 percent of the total pool; instead, it agreed to pay 22 percent of the "losses" and "expenses" of the pooled business. Here, the relevant losses and expenses are those of CCCC. Under the pooling agreement, SNIC agreed to pay 22 percent of those losses, as the September 2001 order correctly states. For that reason, we conclude that the trial court erred in its later determination, following trial, that the pooling agreement obligated SNIC to pay 100 percent of CCCC's losses and expenses.[15]

Nevertheless, OIGA argues that the SNIC deposit is available to pay 100 percent of CCCC's Oregon obligations because ORS 731.608(3) provides that a reinsurer's deposits made under ORS 731.628 "shall be held for the payment of compensation benefits to workers employed by insured employers * * *." OIGA reads too much into the statute. In this case, as discussed above, although the SNIC deposit was made "under ORS 731.628," it was not made with respect to the reinsurance of the CCCC policies for which OIGA now is responsible. In that circumstance, the only plausible basis for OIGA to claim the SNIC deposit is that SNIC is a reinsurer of CCCC. SNIC, of course, *is* a reinsurer of CCCC because of the pooling agreement, and, in the absence of a deposit made with respect to CCCC's liabilities, that agreement both creates and limits its reinsurance obligation. OIGA has no greater right to the deposit under ORS 731.608(3) than the pooling agreement provides—22 percent of CCCC's losses and expenses.

## C. *Piercing the Corporate Veil*

In the alternative, OIGA argues that, because of the wrongful conduct of SNIC and CCCC, we should ignore the separate legal identities of the two companies and allow OIGA to recover from SNIC's deposit for claims that it has paid to CCCC's insureds. The trial court accepted OIGA's

---

[15] Under the pooling agreement, *CalComp* agreed to reinsure 100 percent of CCCC's liabilities. However, CalComp is not a party to this action and has no statutory deposits in Oregon.

argument, holding that it was appropriate to pierce the corporate veil that would otherwise protect SNIC from liability for CCCC's obligations. The Court of Appeals reversed, concluding that neither SNIC nor CCCC engaged in conduct that was "improper" for purposes of piercing the corporate veil. *Neidig*, 208 Or App at 9-18.

1. *The* Amfac *Test*

■      The lower courts and the parties all rely on this court's decision in *Amfac Foods v. Int'l Systems*, 294 Or 94, 108-09, 654 P2d 1092 (1982), where we discussed the elements required to pierce the corporate veil:

> "When a plaintiff seeks to collect a corporate debt from a shareholder by virtue of the shareholder's control over the debtor corporation rather than on some other theory, the plaintiff must allege and prove not only that the debtor corporation was under the actual control of the shareholder but also that the plaintiff's inability to collect from the corporation resulted from some form of improper conduct on the part of the shareholder. This causation requirement has two implications. The shareholder's alleged control over the corporation must not be only potential but must actually have been exercised in a manner either causing the plaintiff to enter the transaction with the corporation or causing the corporation's default on the transaction or a resulting obligation. Likewise, the shareholder's conduct must have been improper either in relation to the plaintiff's entering the transaction or in preventing or interfering with the corporation's performance or ability to perform its obligations toward the plaintiff."

(Footnote omitted.) Although *Amfac* involved a corporate parent and a wholly owned subsidiary, this court's cases make it clear that veil piercing also may apply to claims against affiliated corporations. *See Abbott v. Bob's U-Drive et al*, 222 Or 147, 161-62, 352 P2d 598 (1960) ("It is well established that where corporate affairs are confused with those of the stockholders, a subsidiary *or an affiliate corporation* the corporate veil may be lifted to protect persons whose rights have been jeopardized by the corporate device." (Emphasis added.)).

■      This court's decision in *Amfac* requires a plaintiff seeking to pierce the corporate veil to prove that another

entity actually controlled (or was under common control with) the corporation, that the other entity used its control over the corporation to engage in improper conduct, and that, as a result of the improper conduct, the plaintiff was harmed.[16] As this court recognized in *Amfac*, the test that the case established and that is quoted above, "although easily stated, may not be easily applied." *Amfac*, 294 Or at 111 n 18. Indeed, each part of the test—control, wrongful conduct, and causation—can present close legal and factual questions that must be considered in reaching the ultimate equitable determination as to whether the corporate veil can be pierced. *See* 1 *Fletcher Cyclopedia of the Law of Corporations* § 41.10, 149-50 (2006 revised volume) ("Because there is no single factor that alone justifies piercing the corporate veil, a careful review of the entire relationship between various corporate entities and their directors and officers may reveal that such an equitable action is warranted." (Footnote omitted.)).

## 2. *Control*

■ We begin with the issue of control. Defendants argue that no evidence supports OIGA's assertion that SNIC controlled CCCC or that CCCC and SNIC were under the common control of a third party, at least to the extent required to pierce the corporate veil. As our reference to *Abbott* makes clear, however, this court has long acknowledged that the corporate veil may be pierced not only to prevent one person or corporation's wrongful use of a corporation that it controls

---

[16] The equitable nature of piercing the corporate veil makes it difficult to summarize the legal test in a way that is both accurate and useful. *Fletcher* derives from the cases a three-part inquiry that is consistent with *Amfac*:

"While the factors that will justify piercing the corporate veil vary from jurisdiction to jurisdiction, a number of courts will disregard the existence of a corporate entity when the plaintiff shows: (1) control, not merely majority or complete stock control, but complete domination, not only of the finances, but of policy and business practice in respect to the transaction so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control was used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or to commit a dishonest and unjust act in contravention of the plaintiff's legal rights; and (3) that the aforesaid control and breach of duty proximately caused the injury or unjust loss."

1 *Fletcher Cyclopedia of the Law of Corporations* § 41.10, 143-47 (2006 revised volume) (footnotes omitted).

to harm third parties, but also to prevent affiliated corporations from being used in a similar way. It is not necessary for SNIC itself, rather than the ultimate parent (Superior Group), to have "controlled" CCCC. It is sufficient if the two corporations were under actual common control and were operated so that the improper use of corporate structures caused harm to a third party.

■ On *de novo* review, we find, as did the trial court, that SNIC and CCCC were "operationally a single company for all practical purposes." As noted, SNIC and CCCC, both under the control of Superior Group, shared the same Oregon bank account, office, board members, executive officers, legal counsel, investment managers, accountants, and auditors. Board meetings were held on the same day, and the minutes of the meetings were identical for the two companies. Those who worked at the Oregon office were not clear which corporate entity actually employed them and they sometimes held themselves out to insurance agent customers as employees of "Superior National Insurance Group," although the workers' compensation policies that they wrote in Oregon were policies of CCCC. Finally, the officers that interacted with DCBS and determined when to file required forms (including Schedule P forms), what to include on those forms, and whether or not to make Schedule P deposits, were the same for both defendants.[17]

■ Under *Amfac*, potential control through stock ownership and identity of corporate officers is not sufficient. To pierce the corporate veil, the plaintiff must show that control "actually ha[s] been exercised in a manner either causing plaintiff to enter the transaction with the corporation or causing the corporation's default on the transaction or a resulting obligation." *Amfac*, 294 Or at 108-09. Here, OIGA alleged that the common owners of SNIC and CCCC caused CCCC to violate the insurance code, specifically ORS 731.628, by failing to file an accurate Schedule P when required and to make the required deposit. On *de novo*

---

[17] After mid-March 2000, the Superior Group companies operated under the conservatorship of the California Department of Insurance. However, as described previously, CCCC and SNIC continued to do business in Oregon and to file (or not file) required regulatory forms under the same structure of corporate control and with the same employees as they did before conservatorship.

review, we find that the evidence shows that those commonly controlled companies violated the insurance code by not making the required Schedule P filings. Those filings, had they been made when required by the insurance code and had they been accurate, would have demonstrated to DCBS that CCCC was required to deposit additional millions of dollars as a condition of continuing to do business in Oregon. Because CCCC failed to file its Schedule P form when required, DCBS did not know the extent of CCCC's workers' compensation insurance business in Oregon in 1999 and 2000 or the fact that CCCC was at least $4.4 million short in its required deposit. Without knowledge of those facts, DCBS permitted CCCC to continue to write insurance in Oregon until August 2000—creating insurance obligations that could not be covered by CCCC's inadequate Schedule P deposit and that, when CCCC was declared insolvent, had to be paid by OIGA. We also find that the persons that controlled both SNIC and CCCC caused CCCC to violate the insurance code by not making the required deposit when it was due on March 31, 2000—or at any later time.

Although the facts just discussed demonstrate that SNIC and CCCC were under common control to the extent required under *Amfac*, defendants argue that it is common practice for an insurance holding company to control a number of different subsidiary insurance companies. They note that statutes, including ORS 732.548 to 732.582, provide for the regulation of such holding companies and assert that the operations of those companies will be jeopardized if creditors or other plaintiffs can pierce the corporate veil of one subsidiary insurance company and pursue the assets of an affiliated corporation.

Defendants' concern is misplaced. The "control" contemplated by *Amfac*, as discussed above, is not simply potential control or control of general operations, but actual control over the specific conduct that led to the plaintiff's harm; therefore, even when affiliated corporations share directors, officers, and facilities, the control required to pierce the corporate veil is not necessarily present. Moreover, the corporate veil can be pierced only when the additional elements of improper conduct and causation are met, as described below. Nothing in *Amfac* or in our application of that case in this

context affects the ability of insurance holding companies or other corporations to structure their operations in ways that allow them to take full advantage of the limited liability and other benefits of the corporate structure.

### 3. *Improper Conduct*

■ The second element that must be proved to pierce the corporate veil is improper conduct. *Amfac*, 294 Or at 106. And the relevant conduct is the conduct of the controlling corporation or commonly controlled corporations, not the independent conduct of the subsidiary or affiliated corporation. *Id.* at 108 (analysis centers on "the conduct of the shareholder sought to be charged, and the relationship between the improper conduct and the creditor's claim."). In *Amfac*, the court listed several examples of "improper conduct," including inadequate capitalization; "milking" of a subsidiary corporation through payment of excessive dividends to the parent; misrepresentation; and the use of corporate subsidiaries or affiliates to evade regulatory statutes. 294 Or at 109-10.

In this case, the Court of Appeals concluded that the examples given in *Amfac* and other cases demonstrated that conduct is improper only if it "has an aspect of moral culpability" and "manipulates or abuses the corporate form in some way, thereby drawing funds away from the debtor corporation or conferring a benefit on the party sought be charged." *Neidig*, 208 Or App at 14-15. The Court of Appeals drew the "moral culpability" wording from *Amfac*'s quotation of this court's earlier opinion in *Schlecht v. Equitable Builders*, 272 Or 92, 97, 535 P2d 86 (1975), where this court identified the "real underpinning" of *Schlecht* and other veil-piercing cases as whether there was " '[s]ome form of moral culpability on the part of the parent corporation * * *.' " *Amfac*, 294 Or at 108 (quoting *Schlecht*). On review, OIGA argues that the Court of Appeals erred in requiring a showing that the conduct was morally culpable, although it also contends that, if moral culpability is required, SNIC's conduct here demonstrates moral culpability.

■ OIGA is correct that the phrase "moral culpability," standing alone, provides limited guidance to business entities, lawyers, and lower courts in determining when a corporation's limited liability may be set aside and a creditor or

other plaintiff be allowed to seek recovery against a parent or affiliated corporation. However, the context in which *Schlecht* and *Amfac* used the phrase "moral culpability" makes it clear that the term refers less to abstract notions of morality and more to dishonest or deceitful conduct intended to harm a third party, whether or not that conduct violates a statute or other legal obligation. In *Schlecht,* for example, this court cited with approval cases finding improper conduct when a corporation was used for the "perpetration of a fraud," *"to accomplish fraud or injustice,"* or in *"bad faith * * *."* 272 Or at 96-98 (citations and quotations omitted; emphases in original). *Amfac,* as noted, gave additional examples of improper conduct that would justify piercing the corporate veil, including misrepresentation that is short of fraud, "confusion or commingling of assets," and the evasion of "federal or state regulation * * *." 294 Or at 110.

As an illustration of improper conduct to evade government regulation, the court in *Amfac* cited, among other cases, *United States v. Reading Co.*, 253 US 26, 40 S Ct 425, 64 L Ed 760 (1920). There, the court considered a federal statute that prohibited a railroad from transporting coal that the railroad had mined. The defendant corporation sought to avoid the statutory prohibition by establishing a separate railroad company and coal company under common ownership. Although the defendants did not violate any other statute or legal standard, the court concluded that the form of organization was being used to evade the federal statute and, therefore, ignored it. 253 US at 61-63. *Amfac*'s citation to *Reading* further supports our conclusion that the use of the corporate form to frustrate state or federal regulation can be sufficiently improper conduct, even when there is nothing unlawful about the conduct itself. In *Reading,* for example, that conduct was the creation of a holding company that owned all the stock of a coal company and of a railroad. As used to describe cases such as *Reading,* the phrase "moral culpability" emphasizes the fact that conduct may be improper for purposes of piercing the corporate veil even if it is not "legally" culpable.

Our cases thus do not establish "moral culpability" as a requirement in addition to "improper conduct," and we do not read the Court of Appeals opinion as so holding. Rather,

the Court of Appeals, like this court in *Amfac*, used "moral culpability" as one way of describing the *kind* of improper conduct that is required to pierce the corporate veil. Understood in context, then, the Court of Appeals' use of the term "moral culpability" was not erroneous. That phrase narrows the range of illegal or tortious conduct that can be considered "improper" for purposes of piercing the corporate veil, and it also serves as a reminder that oppressive or manipulative conduct that uses a corporate form to harm a creditor or evade regulation may be improper for those purposes, even if it is not separately actionable.

■ With that background, we turn to the allegedly improper conduct in this case. We begin by noting that the Court of Appeals correctly rejected OIGA's assertion, and the trial court's conclusion, that SNIC violated ORS 731.628 by transferring the deposit at issue here from BICO to SNIC and then renewing the policies originally written by BICO with *CCCC*, rather than with SNIC. The Court of Appeals concluded that "there was a legitimate business reason for renewing [BICO's] policies with CCCC [in 1999]" and "there was no evidence that CCCC [or Superior Group] expected to default on those policies when they were renewed * * *." 208 Or App at 17. For that reason, the Court of Appeals concluded that the evidence did not support the trial court's conclusion that that conduct by SNIC or CCCC was improper. *Id.* Rather, as the Court of Appeals correctly noted, "The conduct that is at the heart of this case is not the renewal of the BICO policies on CCCC paper; it is the failure of CCCC to comply with its Schedule P obligations with respect to those [insurance] policies [written in 1999 and 2000]." *Id.*

■ The Court of Appeals next considered whether CCCC's failure to comply with its obligations under ORS 731.628 for policies written after 1998—that is, to file the Schedule P form when required in 2000 and to make the deposit required by statute—was improper conduct. The Court of Appeals held that that conduct, "standing alone," was "not the type of conduct that would justify the extraordinary remedy of piercing the corporate veil." *Id.* We agree with that statement in abstract, but, on *de novo* review, conclude that it is not consistent with the facts in this case. In our view, the conduct of SNIC and CCCC, taken together,

with respect to the required Schedule P filings and deposits, was improper.

The following facts support the conclusion that improper conduct by the commonly controlled corporations, SNIC and CCCC, violated ORS 731.628. As described previously, SNIC and CCCC essentially operated as a single entity. SNIC and CCCC were required to file their respective Schedule P forms on March 1, 2000. Neither company did so. If SNIC had made an accurate filing at that time, the filing would have revealed to DCBS that SNIC had a deposit of about $10.6 million, that it no longer had a reinsurance obligation for BICO's pre-1999 obligations, and that it now did have a reinsurance obligation to CCCC. As noted previously, if CCCC had made an accurate filing at that time, it would have revealed that CCCC had done extensive business in Oregon during 1999, that CCCC owed an additional deposit of about $4.4 million, and that CCCC was reinsured, in part, by SNIC (and by other Superior Group companies). CCCC also violated Oregon law by failing to make that required additional deposit when it should have by March 31, 2000. Moreover, as far as can be determined from the record, in the first quarter of 2000, CCCC likely had sufficient funds to make a deposit.

On March 30, 2000, DCBS sent a letter to CCCC requesting that it file its Schedule P form that had been due on March 1. On August 7, 2000, DCBS sent another letter, again directing CCCC to make the required filing. CCCC did not respond to the DCBS letters, file its Schedule P form, or increase its Schedule P deposit. Instead, it continued to write workers' compensation insurance policies in Oregon until August 18, 2000. CCCC violated Oregon law by failing to respond promptly and truthfully to the requests for information from DCBS. *See* ORS 731.296 (authorizing DCBS director to inquire about insurers' activities, condition, and transactions, and requiring insurers to respond "promptly and truthfully").

As noted previously, SNIC did file a Schedule P in August, indicating that it had done no business in Oregon and requesting the return of the $10.6 million deposit. That filing was inaccurate and in violation of the insurance code

because it did not disclose, as Schedule P requires, that SNIC had reinsurance obligations to CCCC under the pooling agreement. It also did not disclose that SNIC was in conservatorship proceedings in California. *See* ORS 731.260 (prohibiting insurers from submitting to DCBS any information known to be "false or misleading in any material respect").

On October 4, 2000, CCCC filed Schedule P forms for 1999 and the first half of 2000. The latter form indicated that CCCC owed a deposit of $6.6 million. No part of that deposit was ever paid. Both of CCCC's forms were inaccurate in that they did not disclose CCCC's obligations and benefits under the pooling agreement, as required by Schedule P. Indeed, DCBS did not learn of the pooling agreement until June 2001.

Although we agree with the general statement by the Court of Appeals that one company's failure to file timely and accurate forms or to make required deposits ordinarily would not constitute the kind of improper conduct required to pierce the corporate veil, the facts in this case lead us to conclude that CCCC and SNIC, and the individuals who controlled both of those companies, took those actions to evade government regulation and deceive DCBS. *See Amfac*, 294 Or at 110 (citing, as examples of improper conduct, use of wholly owned subsidiary "to evade federal or state regulation"); *see also Neidig*, 208 Or App at 14-15 (summarizing *Amfac* examples as demonstrating that improper conduct is that which "manipulates or abuses the corporate form in some way, thereby drawing funds away from the debtor corporation or conferring a benefit on the party sought to be charged").

All of the actions described above, whether taken by SNIC or CCCC, were taken by the same individuals. The evidence demonstrates that those individuals made the filings and deposits required by Oregon law only if and when they believed that it was in the overall interest of the Superior Group companies and without regard to the requirements that Oregon law imposed on SNIC and CCCC. Levine's internal memo in August 2000, stating that, as to SNIC, "Oregon owes *us* $10,293,957," while, as to CCCC, "*we* owe Oregon

$6,570,498" (emphases added) illustrates the common control of the companies. The wrongful use of those corporate entities to deceive DCBS was further demonstrated when Levine contemporaneously filed a materially false Schedule P for SNIC—with a request for return of SNIC's deposit—and failed to file a Schedule P for CCCC. As he testified when asked why he filed SNIC's Schedule P, but not CCCC's: "[T]he powers that be were interested in getting back money, not giving money to somebody else. * * * We didn't want to give them money because we were being conserved." Defendants did not respond "promptly and truthfully" to the DCBS inquiries. Even the filings that were made were misleading, inaccurate, and untimely, in violation of Oregon statutes. We have little difficulty concluding, on these facts, that SNIC and CCCC engaged in improper conduct that justifies piercing the corporate veil.[18]

### 4. *Harm to OIGA*

Defendants argue that, even if SNIC or CCCC engaged in improper conduct, there is no connection between the improper conduct and any harm resulting to OIGA, which was required to pay claims that CCCC failed to pay. In particular, defendants assert that CCCC's failure to file its 1999 Schedule P and the required security deposit caused no harm. Defendants state that CCCC filed an accurate Schedule P on October 4, 2000, and that CCCC failed to make the required deposit of $6.6 million at that time because of "lack of funds."

Defendants ignore the fact that CCCC's Schedule P form was due on March 1, 2000. Although the record does not contain financial statements as of that date, it does contain an independent auditors' report setting out SNIC's financial condition as of December 31, 1999. That report also discussed

---

[18] As noted, the Court of Appeals stated that "[s]tanding alone, however, CCCC's failure to make a security deposit under ORS 731.628 is not the type of conduct that would justify the extraordinary remedy of piercing the corporate veil." *Neidig*, 208 Or App at 17. It also concluded that "there was nothing 'improper' about SNIC's refund request." *Id.* at 18. In our view, the Court of Appeals erred in examining those aspects of defendants' conduct "standing alone." Rather, the evidence at trial showed that the same individuals operated SNIC and CCCC during 2000 in a manner that evaded Oregon law and prevented DCBS from exercising its regulatory authority to protect Oregon consumers.

CCCC's capital in comparison to the amount of capital recommended by the National Association of Insurance Commissioners (NAIC) and stated that CCCC "has capital in excess of any of the action levels." (SNIC, on the other hand, had capital at the "most adverse" level of the NAIC model.) The record also contains evidence that, as of early 2000, Superior Group had added $5.4 million to CCCC's capital in connection with its anticipated redomestication from New York to California. In other words, the record indicates that, near the time that it was supposed to make its Schedule P filing and deposit, CCCC was not experiencing any level of capital deficiency.

Moreover, defendants' claim that CCCC lacked funds to make any deposit—and that its violations of the insurance code therefore did not harm OIGA—ignores the common control of SNIC and CCCC and the failure of SNIC to file *its* Schedule P form when it was due in March 2000. If SNIC had made an accurate filing at that time, the filing would have revealed to DCBS that SNIC was a reinsurer of CCCC and that SNIC had $10.6 million on deposit with DCBS. As noted previously, if CCCC had made an accurate filing at that time, it would have revealed that CCCC had done extensive business in Oregon during 1999 and that CCCC owed an additional deposit of $4.4 million. With that information, DCBS could have requested that CCCC and SNIC agree that SNIC nominate part of its deposit pursuant to ORS 731.628 to meet CCCC's deposit requirements; if defendants had declined that request, DCBS would have been able to take remedial action to prevent any further harm (*e.g.*, by ordering CCCC to stop writing new policies in Oregon). Instead, CCCC continued to write new workers' compensation insurance policies in Oregon until August 18, 2000, and it did not make any deposit to cover its additional statutory deposit obligation.

If defendants had complied with Oregon law, they would have made the filings and the security deposits described above. Like many other regulatory schemes, insurance regulation relies on regulated companies to comply in good faith with clear statutory requirements. State regulators lack the resources to investigate immediately every late filing or to audit the accounts of each regulated entity. Here,

two entities that for all practical purposes operated as one company acted in bad faith to violate clear regulatory statutes, deceive DCBS, and avoid making required deposits. Because of that improper conduct, DCBS permitted CCCC to continue to write millions of dollars of additional workers' compensation insurance in Oregon—resulting in additional losses for OIGA.

No evidence in the record supports defendants' assertion that CCCC simply ran out of money in March 2000—no bank statement, no financial report of CCCC's finances for that time period, no independent auditors' report for CCCC for 2000. Superior Group filed for bankruptcy in late April 2000, but as of March 2000, CCCC continued to write policies and receive premiums in Oregon and a review of its 1999 year-end financial condition had identified no capital insufficiency. While OIGA's evidence that CCCC could have made a deposit when required in March 2000 was not extensive, there was no contrary evidence. We agree with the trial court that,

> "Apparently, the real reason [CCCC] did not make the required deposit was not because of its actual inability to pay. Rather, it was because its officers were uncertain as to what would happen when they were taken over by California's Conservation and Liquidation Office and they wanted to conserve capital."[19]

Applying the test articulated in *Amfac*, we conclude that defendants' conduct was "improper * * * in preventing or interfering with [CCCC's] performance or ability to perform its obligations [here, its statutory filing and deposit obligations] toward [DCBS,]" 294 Or at 109, and that that improper conduct caused OIGA's injury.

## IV. CONCLUSION

For the reasons described above, we conclude that SNIC and CCCC were under common control and were used to cause CCCC to violate ORS 731.628 and other provisions of the insurance code. We further conclude that that conduct was improper and that it caused harm to OIGA. We affirm the trial court's judgment that the corporate veil between

---

[19] On *de novo* review, the Court of Appeals made no contrary finding.

SNIC and CCCC is pierced with regard to SNIC's deposit with DCBS for the purpose of reimbursing OIGA and DCBS for losses and expenses related to its payment of claims by CCCC's insureds, as authorized by ORS 731.608(3), ORS 734.630(2), and ORS 734.635.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.